## Richmond.

## HERMAN JARRELL V. COMMONWEALTH.

January 19, 1922.

Absent, Saunders, J.

1. HOMICIDE—*Indictment—Common-Law Form—Murder in the First Degree—Murder in Second Degree.*—An indictment for murder in the common-law form, not expressly charging murder in the first degree, is good as an indictment for murder in the first degree, in Virginia, and even in the jurisdictions where it is held that such indictment is not good as an indictment for murder in the first degree, it will sustain a verdict and judgment for murder in the second degree.

2. CRIMINAL LAW—*Indictment and Information—Bill of Particulars.*—The accused has the right to have the Commonwealth file a bill of particulars in certain cases, but this right does not arise in all criminal cases, but only in those cases in which such a bill is necessary to supply the fault of generality or uncertainty in the averments of the indictment drawn in question, in stating the cause and nature of the accusation.

3. HOMICIDE—*Indictment and Information—Bill of Particulars—Case at Bar.*—In the instant case, a prosecution for homicide, there was no fault of generality or uncertainty in the averments in a count of the indictment, which expressly and distinctly charged the accused, as principal in the first degree, with a single act, namely, the throwing of a rock which gave deceased the mortal wound, and joining as defendants in the same count two others as participants in the alleged crime, who were also charged with the same act as principals in the first degree.

4. HOMICIDE—*Indictment and Information—Principal and Accessory.*—An indictment for homicide charged accused jointly with others with doing an act (the throwing of a rock) which it was physically possible only for one of them to have done; hence it was contended for accused that the indictment in fact charged the accused with two offenses, that of committing the crime as principal in the first degree, and that of committing it as an accessory by aiding and abetting its commission.

*Held:* That while it was true that these two offenses were charged,

yet that is permissible in such a case, and creates no uncertainty in the averment with respect to what two offenses are thus charged.

5. JURY—*Drawing of Jury—Presence of Commissioner in Chancery.*—The refusal of the court to quash the venire on the ground that the names of the veniremen were drawn in the presence of two citizens called upon by the clerk, without it appearing from the record that the presence of the commissioner in chancery could not be obtained, as required by statute, was not error, there being no evidence in the record tending to show that the irregularity in question probably caused injustice to the Commonwealth or to the accused, Acts 1920, p. 25 *et seq.*

6. HOMICIDE—*Evidence—Previous Difficulty Between Deceased and Another.*—In a prosecution for homicide, one of the principal issues in the case was whether or not accused committed the homicide in retaliation for the conduct of the deceased in a difficulty between deceased and an uncle of accused. There was ample evidence to sustain the jury in finding that this was the motive for the crime.

   *Held:* That the court committed no error in admitting, over the objection of the accused, evidence of the previous difficulty between deceased and the uncle of accused.

7. CONSPIRACY—*Declarations of Co-Conspirators—Declarations After the Event.*—Declarations of a conspirator, after the object of the conspiracy had been accomplished, are not admissible against his co-conspirator.

8. CONSPIRACY—*Declarations of Co-Conspirators—Declarations After the Event—Harmless Error.*—The admission in evidence of a declaration of a co-conspirator after the homicide that if accused had not killed deceased, he would have done so, is harmless error, where there was other testimony that the co-conspirator had made another declaration to the same effect before the homicide, and where accused was found guilty only of murder in the second degree, indicating that the jury were not influenced by such declarations.

9. WITNESSES—*Separation of Witnesses—Disobedience of Order.*—A witness remaining in court, or listening to testimony through a window, in violation of an order of separation, may, nevertheless, be examined, his conduct bearing only upon his credibility and subjecting him to being punished for contempt. The trial court has no right to exclude such a witness from testifying, and no distinction is made in this respect between witnesses in rebuttal and other witnesses.

10. HOMICIDE—*Evidence—Declarations of Accomplices.*—In a prose-

cution for homicide, relevant declarations of an accomplice, not made in the presence of accused but prior to the homicide, are admissible.

11. HOMICIDE—*Evidence—Declarations of Deceased.*—In a prosecution for homicide alleged to have been in retaliation for a prior difficulty between deceased and an uncle of accused, a declaration of deceased after the prior difficulty, "If I run now, will always have to run," was either immaterial or had such a remote bearing on the homicide that its admission could not have been prejudicial to accused.

12. HOMICIDE—*Evidence — Declarations — Declarations Elicited on Cross-Examination by Accused.*—An accused cannot complain of a declaration elicited on cross-examination on his behalf.

13. HOMICIDE — *Instructions—Harmless Error—Error in Instructions as to Murder in the First Degree where Accused is Found Guilty of Murder in the Second Degree.*—Error in instructions with respect to the subject of murder in the first degree, where the jury found the accused guilty only of murder in the second degree, is harmless, unless there are special circumstances indicating that the jury were influenced in their verdict by such error.

14. HOMICIDE—*Instructions—Abstract Instructions—Intending Consequences of Act.*—Where accused was charged with killing deceased with a rock, an instruction "that a man shall be taken to intend that which he does, or that which is the necessary consequence of his act," is not open to objection as being a mere abstract proposition, and misleading.

15. HOMICIDE—*Instructions—Provocation—Evidence to Support Instruction.*—In a prosecution for homicide, the evidence tended to show that the attitude of deceased towards the accused at the time of the homicide was not seriously, if at all, threatening to accused, and was not the real provocation for the killing. The trial court gave the following instruction: "That a mortal wound given with a deadly instrument in the previous possession of the slayer, without any or upon very slight provocation, is *prima facie* murder, and throws upon the accused the necessity of proving extenuating circumstances."

*Held:* That there was evidence to support the instruction.

16. DEADLY WEAPON—*Questions of Law and Fact—Raising Question on Appeal.*—Whether a weapon is a deadly weapon may under some circumstances become a question of law and fact to be determined by the jury under proper instructions. But in the case in judgment no issue was raised by the accused on this subject in the trial court; one of the instructions asked for by the accused contained the assumption that the weapon used, a

rock, was a deadly weapon; and, the trial having proceeded with that assumption on both sides, as an uncontroverted fact, it is too late to raise that issue on appeal.

17. HOMICIDE — *Instructions* — *Abstract Propositions* — *Justifiable Homicide.*—Instructions upon the subject of justifiable homicide in the usual approved form, directly applicable to the case in view of the claim of accused that the killing was in self-defense are not open to objection as containing merely abstract propositions of law.

18. HOMICIDE—*Instructions—Repetition.*—There was no error in the refusal of instructions asked for by the accused, where they were fully covered by the instruction given.

19. HOMICIDE—*Instructions—Flight.*—In the instant case the Commonwealth introduced no evidence tending to show that accused fled to avoid arrest, the evidence merely showing that he had enlisted pursuant to a purpose formed before the homicide, and was at camp when he was arrested, and that his whereabouts were ascertained by the sheriff through a letter to his father, stating that he wanted to come home and stand trial, which letter was read to the jury.

*Held:* That the refusal of the court to give an instruction that "such flight" could not be considered as evidence against accused, if error, was harmless.

20. INSTRUCTIONS—*Weight of Evidence—Disregarding all Testimony of witness where he has Testified Falsely in one Respect.*— An instruction that if the jury believed that witnesses, naming them, have knowingly testified untruthfully on any material matter, they might disregard the whole of their testimony, would be improper, because of the singling out by name the witnesses.

21. INSTRUCTIONS—*Weight of Evidence—Disregarding all Testimony of Witness where he has Testified Falsely in one Respect.*— If it is an admitted or uncontroverted fact, or there is clear and convincing evidence that a witness·has willfully testified untruthfully on any material matter, the trial court, in its discretion, may properly give an instruction, couched in general terms, to the effect that if the jury so believe, they are at liberty to disregard the whole of the witness's testimony. But the trial court should in every case act with caution.

22. HOMICIDE—*Instructions—"Equally" Susceptible of Two Interpretations.*—In a prosecution for homicide, the jury were instructed that where a fact is "equally susceptible of two interpretations, one of which is consistent with the innocence of the accused," the jury cannot arbitrarily adopt that interpretation which incriminates accused.

*Held:* That the use of the word "equally" in such a connection, though proper in a civil case, was not proper in a criminal case. But as it in no way appeared that the verdict of the jury was influenced by such error, it must be regarded as harmless.

23. HOMICIDE—*Evidence Sufficient to Support Verdict—Killing with Rock where Several were Engaged in Affray—Case at Bar.*— In the instant case it was contended for accused that the testimony of all of the eyewitnesses of the occurrence left it undetermined who threw the fatal rock. While this was true so far as direct testimony was concerned, there was evidence showing the circumstances of the positions and attitude of the parties engaged in the affray, which tended to show that the accused struck the fatal blow with the rock, and there was testimony that the accused admitted that he did so.

*Held:* That the trial court did not err in refusing to set aside the verdict as contrary to the law and the evidence.

24. HOMICIDE—*Admission Coupled with Claim of Self-Defense— Question for Jury.*—Where there is an admission by accused that he struck the fatal blow, coupled with a claim on his part that he did so in self-defense, the jury are at liberty, if they feel the evidence warrants it, to accept the truth of a portion of such admission and to discard the rest.

25. APPEAL AND ERROR—*Moot Question—Application for Bail.*— Where a conviction of murder in the second degree is sustained on appeal, an assignment of error that the trial court erred in overruling the application of the accused for bail presents a purely moot question.

Error to a judgment of the Circuit Court of Madison county.

*Affirmed.*

There was a trial by jury and the accused, the plaintiff in error in this case, was found guilty of murder in the second degree, as charged in the first count of the indictment, the verdict fixing his punishment at fifteen years in the penitentiary. The judgment under review was entered accordingly.

The indictment in its charge of the murder was in the

common law form for murder, not expressly charging murder in the first degree. The first count of the indictment, under which the accused was tried and convicted, as aforesaid, jointly indicts the accused and two others, Lester Lamb and J. N. Kirtley, with the crime aforesaid, charging the crime as having been committed by them jointly as principals in the first degree, by making an assault, in which they threw a certain rock, "in their hands then and there had and held, in, against and upon the forehead" of the deceased, one J. A. McDaniel, giving the latter the mortal wound of which, in a few hours thereafter, he died. There was one other count in the indictment jointly indicting the same three parties with the same offense; and two other counts indicting the accused with the same offense, charged as having been committed in practically the same manner by the accused alone; but on motion of the accused the Commonwealth was required to elect on which count it would prosecute and elected to prosecute and did prosecute the accused under the first count aforesaid.

The material facts as the jury were warranted in finding them, and certain testimony which the trial court allowed to go to the jury over the objection of the accused, needful to be here mentioned, may be stated as follows:

The homicide occurred about midnight Christmas Eve, December 24, 1920. On that night, which was a moonlight night, the deceased, along with one C. B. Jarrell and a number of the neighbors, playing the violin and having a "Christmas Eve time," came with C. B. Jarrell to his home arriving about nine or ten o'clock, to give a serenade there; and some of the party expected to go on with the serenade at other homes in the vicinity, although C. B. Jarrell did not intend to go any further than to his own home. They found there the accused, a nephew of C. B. Jarrell, J. N. Kirtley, a family connection of his, and Lester Lamb, who lived at C. B. Jarrell's as his home when not away at work, and also

other members of the family of C. B. Jarrell and several others. There was music for a while, and dancing, after which several of the young men, some five or more, set out to go to the home of a neighbor. As these young men were going up a hill near C. B. Jarrell's residence, they were shooting fire crackers and became quite boisterous. On hearing this the deceased and C. B. Jarrell walked up on the hill where the young men were. Soon after getting there the deceased and C. B. Jarrell got into a fight, which resulted in the deceased hitting Jarrell on the head with a rock, giving him quite a severe wound which bled profusely. Thereupon, Jarrell returned to his house, coming to his front gate, as his wife testifies, "with his coat * * * all bloody; talked as if he did not know what he was talking about * * * feeling his way along, we went to meet him, he was blind." At this time J. P. Thomas came up and said that the deceased had hit Jarrell.

The accused, Kirtley and Lamb, were not among those present when the fight occurred between the deceased and C. B. Jarrell, but the accused and the two jointly indicted with him were at the house when C. B. Jarrell arrived after being wounded, as aforesaid; and either saw or were informed of his wounded condition. Whereupon, they severally set out for the hill, and before arriving there all three of them were told that the deceased was the man who wounded Jarrell. Thereupon, on their arrival on the hill, they got together, and together approached and attacked the deceased, in retaliation, as the jury were warranted in inferring, for his having wounded Jarrell, as aforesaid. Others took part in the affray, and there was for a time a promiscuous fight with rocks and wrestling, in the midst of which the accused threw the rock at deceased which struck him on the head, causing the mortal wound alleged in the indictment, and then jumped on the deceased, and was pulled off by one of the participants in the affray.

The testimony which the trial court allowed to go to the jury over the objection of the accused was the following: J. P. Thomas, a witness for the Commonwealth, testified that as witness came down from the hill following C. B. Jarrell, after the latter had been wounded, as aforesaid, witness met Lamb, Kirtley and the accused, in the order named, going up on the hill. That Lamb asked witness: "Who hit uncle Charlie?" meaning C. B. Jarrell. That witness replied that he thought the deceased hit him. Whereupon Lamb said: "I will knock him in the head"; that Lamb passed witness and called back for the accused. That the accused said: "What do you want?" That Lamb said: "Come up here right quick." That witness next met Kirtley, who asked: "Who hit C. B. Jarrell?" That witness replied that the deceased hit him he thought. That Kirtley said: "That is all right; I will kill the damn rascal that did it." That witness next met Jesse Jarrell, who said nothing; and then met the deceased, who said nothing. That the accused was not present when Lamb and Kirtley made the statements aforesaid. On cross-examination, J. P. Thomas testified that Harry Jarrell, at some time not fixed by the witness, when the accused was not present, said "This is a hell of a bad thing for nothing."

In testifying concerning the wounding of C. B. Jarrell by the deceased one of the witnesses stated that the deceased said, after the fight with C. B. Jarrell, "If I run now, will always have to run." The accused objected to the admission of this in evidence, but the court overruled the objection.

Other pertinent matters are referred to in the opinion of the court.

*Will A. Cook* and *John S. Chapman,* for the plaintiff in error.

*John R. Saunders, Attorney General; J. D. Hank, Jr., Assistant Attorney General,* and *Leon M. Bazile, Second Assistant Attorney General,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions raised by the assignments of error will be disposed of in their order as stated below.

[1] 1. The first assignment of error is that the court erred in refusing to quash the indictment because it was in the common law form of an indictment for murder and did not expressly charge murder in the first degree.

We find no merit in this assignment of error.

Although a number of courts of other jurisdictions are not in accord with the Virginia court on this subject, and so eminent an authority as Mr. Bishop (2 Bish. New Cr. Prac.—4th ed.—secs. 566-587) takes a view contrary to the holding in Virginia with respect thereto, the rule has been for so long and so firmly established in this jurisdiction that an indictment for murder in the common law form is good as an indictment for murder in the first degree, that we are unwilling to change that rule. *Miller's Case,* 1 Va. Cas. (3 Va.) 310; *Wick's Case,* 2 Va. Cas. (4 Va.) 387; *Livingston's Case,* 55 Va. (14 Gratt.) 595; *Cluverius' Case,* 81 Va. 787; *Kibler's Case,* 94 Va. 804, 26 S. E. 858; *Thurman's Case,* 107 Va. 912, 60 S. E. 99. Moreover, the accused in the case at bar was not convicted of murder in the first degree, but only of murder in the second degree. Under the ruling of all the courts, the indictment was good as an indictment for murder in the second degree. Hence, according to all of the authorities, the indictment is sufficient to sustain the verdict and judgment under review.

[2, 3] 2. The second assignment of error is that the court erred in not requiring the Commonwealth to file a bill of

particulars, because "the wording of the first count of the indictment, under which he (the accused) was tried, made it proper that a bill of particulars should have been filed, so as to put him in a fair position to defend himself?

We find no merit in this assignment.

It is true that in *Pine* v. *Commonwealth*, 121 Va. 812, 336-8, 93 S. E. 652, it is held that the accused has the right to have the Commonwealth file a bill of particulars in certain cases, but this right does not arise in all criminal cases. As there held, it arises only in those cases in which such a bill is necessary to "supply the fault of generality or uncertainty" in the averments of the indictment drawn in question, in stating the cause and nature of the accusation. In the case at bar there is no fault of generality or uncertainty of this character in the averments in the first count of the indictment, which alone is drawn in question by the assignment of error under consideration. This count expressly and distinctly charges the accused with a single act, namely, the throwing of the rock which gave the mortal wound, as a principal in the first degree, and it joins as defendants, in the same count, two others as participants in the alleged crime, who are also charged with the same act as principals in the first degree. The accused was tried upon this count and convicted.

[4] It is urged in argument for the accused, to sustain the assignment of error under consideration, that the accused is charged in the first count jointly with others with doing an act (the throwing of the rock), which it was physically possible only for one of them to have done, hence this count in fact charges the accused with two offenses, that of committing the crime as principal in the first degree, and that of committing it as an accessory, by aiding and abetting its commission. It is true that these two offenses are charged. But that is permissible in such a case, and it has been too long and too well settled that this creates no un-

certainty in the averment with respect to what two of-
fenses are thus charged to now admit of question.

As said in 1 Bish. Cr. Law (4th ed.), sec. 467: "If the
prosecuting power chooses, it may join as defendants in
one count all the participants in a crime.  As to which, the
test is said to be to consider, 'whether each offender be
guilty in some degree of the same crime, so that he might
be separately convicted even though another was the ac-
tual perpetrator.  If each may be so convicted their guilt
is joint;   *   *   *' "

In *Idem*, sec. 468, this is said: "Principals of the first and
second degree may be joined; as   *   *   *   in malicious
shooting   *   *   *   there may be several defendants, and
'all jointly charged with the single act,' though * * * it
was by one of them alone."

In 2 Bish. New Cr. Prac. (4th ed.), sec. 3, this is said:
"Where A and B are present, and A committs an offense in
which B aids and assists him, the indictment may   *   *   *
charge them both as principals in the first degree; for the
act of the one is the act of the other.  And upon such an
indictment, B, who was present aiding and abetting, may
be convicted, though A is acquitted.  So A and B, if present
aiding and abetting, may be convicted, though C, a person
not named in the indictment, committed the act.  Again,
if an indictment for murder charge that A gave the mor-
tal stroke, and that B was present aiding and abetting,
both A and B may be convicted, though it turn out that B
struck the blow, and that A was present aiding and abetting.
To go one step further, upon a similar indictment, charg-
ing A as principal in the first degree, and B as present
aiding and abetting, B may be convicted though A be ac-
quitted."

In *Idem*, sec. 6a, this is said: "'*   *   *   the averment was
adjudged sufficient that three defendants did, with a stick

of wood, which each severally had and held in their several right hands, inflict a mortal wound; * * *"

[5] 3. The third assignment of error is that the court refused to quash the venire on the ground that the names of the veniremen were drawn in the presence of two citizens called upon by the clerk, without it appearing from the record that the presence of the commissioner in chancery could not be obtained, as is required by statute to be the case before the drawing can lawfully take place before the two citizens. It is contended that the statute is mandatory in this particular, and that not only is a venire rendered invalid by such an irregularity, but that the failure of the record to show affirmatively that no such irregularity occurred destroys the validity of the venire, however in conformity with the statute the drawing may have been in fact.

In view of the express provisions of the statute which were not formerly embraced therein, and the further considerations, now to be mentioned, we find no merit in this assignment of error.

The provision of the statute here alluded to (Acts 1920, p. 25, *et seq.*), so far as material, is as follows: "No irregularity * * * in the drawing * * * of jurors * * * shall be cause for summoning a new panel or for setting aside a verdict or granting a new trial, unless * * * it appears that such irregularity * * * was * * * such as to probably cause injustice to the Commonwealth or to the accused * * *"

There is no evidence in the record tending to show that the irregularity in question probably caused any injustice to the Commonwealth or to the accused.

[6] 4. The fourth assignment of error is that the court erred in admitting, over the objection of the accused, evidence of the difficulty between C. B. Jarrell and the deceased and all evidence leading up to and connected with such dif-

ficulty, on the ground that the accused was in no way connected therewith by the evidence in the case.

Whether this assignment of error is well taken depends entirely upon whether the ground upon which it is based can be sustained. That, of course, is a question of fact. That question of fact was submitted to the jury by the instruction of the court. One of the principal issues in the case was whether or not the accused committed the homicide in retaliation for the conduct of the deceased in the difficulty between him and C. B. Jarrell. There was ample evidence to sustain the jury in finding that this was the motive for the crime. In this way the accused was connected with such difficulty. Hence we find no error in the action of the court in the particular in question.

[7, 8] 5. The fifth assignment of error is that the court erred in admitting in evidence the testimony of a witness that he heard Kirtley, on the evening after the homicide, not in the presence of accused, say that if the accused "had not killed McDaniel, he would."

This being the declaration of a co-conspirator after the object of the conspiracy had been accomplished, it was error to admit it in evidence against the accused, according to the general rule on the subject. 1 Bish. New Cr. Law (4th ed.), sec. 1248 (2) ; *Burford* v. *Commonwealth, ante,* p. 512, 110 S. E. 428, decided today. But the bearing of this testimony against the accused was that it tended to show that he was guilty of murder in the first degree, in that he acted in concert with Kirtley in execution of the premeditated and specific purpose to kill the deceased. And there was other testimony for the Commonwealth, which is above referred to, that Kirtley made a declaration before the homicide of this purpose on his part, which was unquestionably admissible in evidence under the rule aforesaid, namely, the declaration of Kirtley to which Thomas testified. The verdict of the jury, however, finding the accused guilty only of murder in the

second degree, indicates that they were not influenced in reaching the verdict against the accused by any of the testimony concerning the purpose of Kirtley to kill the deceased; but based the verdict on other testimony in the case, of which the quantity was ample to sustain the verdict, which tended indeed to show that the accused made the assault upon the deceased in concert with Kirtley and Lamb in retaliation for the assault of the deceased on C. B. Jarrell, but with the intent merely to do the deceased serious bodily harm.   Therefore, it does not appear probable from the record before us that the accused was prejudiced by the admission of the declaration in question.   On the contrary it seems plain that the accused was not prejudiced thereby. Hence, we consider the admission of such declaration in evidence as harmless error.

[9] 6. The sixth assignment of error is that the court erred in allowing Harry Jarrell, a witness for the Commonwealth, to testify in the case, he having listened through a window "to the evidence" after he, along with other expected witnesses, had been excluded from the court room.

It is stated in the brief for the accused that the witness in question was put on the stand as a witness in rebuttal, "which fact distinguishes this case from the cases decided by our courts."   No cases are cited in the brief, nor were any cited in oral argument for the accused on the question under consideration.   The leading case in Virginia on the subject is *Hey's Case*, 32 Gratt. (73 Va.) 946, 34 Am. Rep. 799, in which the opinion of the court was delivered by Judge E. C. Burks.   It is therein laid down that a witness remaining in court in violation of an order of separation may, nevertheless, be examined, his conduct bearing only upon his credibility and subjecting him to being punished for contempt.   It is therein held in accordance with what seems to have always been the rule in this country, and the modern rule in England, that the trial judge has no right to exclude

such a witness from testifying. No distinction seems to have been made by the authorities between witnesses in rebuttal and other witnesses; and no reason is specified in argument, and we perceive none, why the rule should not be, at the least, as liberal as applied to rebuttal as to other witnesses. In practice, indeed, it is not usually known what witnesses will be used in rebuttal. They are usually some of those who have testified in chief, who are customarily allowed to remain in the court room after giving their testimony and are allowed to hear the remaining testimony for the side of the case on which they testify and also the testimony for the other side, without objection.

[10-12] 7. The seventh assignment of error is that the court erred in allowing the Commonwealth to introduce in evidence the declarations of Kirtley, Lamb and Harry Jarrell, testified to by J. P. Thomas; and erred also in admitting in evidence the statement of the deceased, "if I run now, will always have to run."

We find no merit in this assignment.

The testimony of J. P. Thomas concerning the declaration of Harry Jarrell, was elicited by the cross-examination in behalf of the accused. The declarations of Kirtley and Lamb were admissible under the general rule referred to above in what is said in connection with the fifth assignment of error. And as to the statement of the deceased, it related to his remaining on the hill after he had wounded C. B. Jarrell, and not to his fight with the accused, so that it was either immaterial or had such a remote bearing on the homicide involved in the case in judgment that we cannot regard the admitting of such statement in evidence as having had any material bearing on the conclusions of the jury to the prejudice of the accused, so as to constitute reversible error.

8. The eighth assignment of error covers the same subjects as the 4th and 7th assignments, above dealt with.

9. The ninth assignment of error is that the court erred in giving the instructions it gave at the request of the Commonwealth, fourteen in number, and occupying three pages of the record. None of the alleged errors in these instructions is pointed out in the petition for the writ of error. The brief for the accused points out certain alleged errors in these instructions, which will be now dealt with.

[13] (a) There are alleged errors pointed out in the third, fourth and fifth instructions, in that, it is urged, they do not correctly instruct the jury on the subject of murder in the first degree. We deem it sufficient to say of these instructions that they are in the usual form which has been approved by the decisions and correctly propound the law applicable to the theory of the Commonwealth as applied to the testimony in the case. But if there had been error in these instructions with respect to the subject of murder in the first degree, as the jury found the accused guilty only of murder in the second degree, and thereby acquitted him of murder in the first degree, such error would have been harmless, unless there were some special circumstances indicating that the jury were influenced in their verdict by the errors with respect to the defining of murder in the first degree. No such circumstance appears from the record before us. It would, therefore, serve no useful purpose for us to here set out in detail the points of error urged upon us touching these instructions.

[14] (b) The sixth instruction is as follows:

"That the rule of law is that a man shall be taken to intend that which he does or that which is the necessary consequences of his act."

The objection to this instruction is that it is purely an abstract proposition and is misleading. The instruction was directly applicable to the theory of the Commonwealth with respect to the testimony concerning the conduct of the

accused in striking the fatal blow with the rock. Hence we find no merit in this objection.

[15, 16] (c) The seventh instruction was as follows:

"That a mortal wound given with a deadly instrument in the previous possession of the slayer, without any or upon very slight provocation, is *prima facie* murder, and throws upon the accused the necessity of proving extenuating circumstances."

There are two objections to this instruction.

The first objection is that it is based upon the theory that the assault was without any or upon very slight provocation and that there is no evidence in the case to support this theory. This position as to the evidence is not well taken. There was ample evidence to support the theory mentioned, if the jury believed the testimony for the Commonwealth which tended to show that the attitude of the deceased at the time of and immediately preceding the homicide was not seriously, if at all, threatening to the accused, and was not in truth the real provocation for the killing; but that retaliation for the wounding of C. B. Jarrell was the real motive for the killing.

The second objection under consideration is that the instruction assumes that the weapon used was a deadly weapon. It is true that whether a weapon is a deadly weapon may under some circumstances become a question of law and fact to be determined by the jury under proper instructions. 13 R. C. L., sec. 48, p. 744. But in the case in judgment no issue was raised by the accused on this subject in the trial court; one of the instructions asked for by the accused contained the assumption that the weapon used was a deadly weapon; and the trial having proceeded with that assumption on both sides, as an uncontroverted fact, it is too late to raise that issue on appeal.

[17] (d) The eighth, ninth, tenth, eleventh and twelfth instructions are objected to as containing merely abstract

propositions of law. We do not think that this objection is well taken. These instructions are upon the subject of justifiable homicide, were directly applicable to the case in view of the claim of the accused that the killing was in self-defense, and were in the usual form approved by the decisions.

(e) The thirteenth instruction submits to the jury the question of fact whether the motive for the homicide was the striking by the deceased of the uncle of the accused with a rock, in the aforesaid previous fight. The objection to this instruction is that there was no evidence that the accused, before he went to the scene of the crime, knew that his uncle had been assaulted by the deceased.

As appears from the statement preceding this opinion, there was ample evidence from which the jury were warranted in inferring that the accused had the knowledge in question before the homicide.

10. The tenth assignment of error is that the court erred in refusing to give certain instructions at the request of the accused.

[18] The court gave fourteen instructions at the request of the Commonwealth, a number of which were applicable also to the theories of the defense. The court also gave five instructions asked for by the accused. All of the instructions asked for by the accused and refused, except two, may be disposed of by saying that they were already covered by the instructions given, so that there was no error in their refusal. The jury had been fully instructed.

[19] The two instructions asked for and refused, as just stated, which we except from the general statement just made, will now be considered.

One of these two instructions is as follows: "The court instructs the jury that flight, to avoid arrest, may be considered a circumstance going to show guilt; but the jury is further instructed, that if they believe from the evidence

that the accused left the county and joined the army pursuant to a purpose formed before the killing of deceased, and because accused believed he was in danger of death or great bodily harm at the hands of the relatives and friends of deceased, then they cannot consider such flight as evidence against them."

The Commonwealth introduced no evidence tending to show that the accused fled to avoid arrest. The testimony for the Commonwealth concerning the arrest of the accused showed merely that he had enlisted as a soldier and was at Camp Lee when he was arrested; and that his being there was ascertained by the sheriff through a letter of the accused to his father, stating that he wanted to come and stand his trial. This letter was read to the jury by the sheriff, a witness for the Commonwealth. The accused testified to the same effect, and that he left the county and joined the army pursuant to a purpose formed before the homicide and because accused was told that a brother of the deceased was likely to kill him. There was no testimony introduced by the Commonwealth in rebuttal on this subject. No instruction was given for or offered by the Commonwealth about it; and from the record before us it seems plain that there was no issue made in the trial court touching this matter. It seems to us, therefore, that the refusal of this instruction, if error, was harmless error, for which the case will not be reversed.

[20, 21] The other of the two refused instructions under consideration is as follows: "The court instructs the jury that if they believe that Harry Jarrell and J. P. Thomas, or either of them, have knowingly testified untruthfully on any material matter in this case, they are at liberty to disregard the whole of their testimony."

It has been held that such an instruction should be given (*State* v. *Perry*, 41 W. Va. 641, 24 S. E. 634) ; but it is also held that whether it should be given or not, in a particu-

lar case, rests largely in the discretion of the trial judge, and in the absence of a statute authorizing it, should never be given, unless the trial judge suspects that wilful false swearing has been done in the case. 14 R. C. L., sec. 11, pp. 736-7, citing *State* v. *Hickam,* 95 Mo. 322, 8 S. W. 252, 6 Am. St. Rep. 54, and *Schmidt* v. *St. Louis R. Co.,* 149 Mo. 269, 50 S. W. 921, 73 Am. St. Rep. 380. As said in *State* v. *Hickman,* such an instruction "should not be given as a matter of course   *   *   *   and the propriety of giving it in any particular case must be left largely to the judgment and discretion of the trial court." As said in *Schmidt* v. *St. Louis R. Co., supra,* in regard to such an instruction, "The furthest the court can go in that direction without trenching on the province of the jury is to instruct them in effect that if they believe from the evidence that any witness has willfully sworn falsely as to any material fact in the case, they may, if they see fit for that reason disregard the whole of that witness's testimony. But in the giving of that instruction the court should act with caution. It is not to be given in every case and should never be given unless the trial judge strongly suspects that willful false swearing has been done in the case."

Our own views upon the subject under consideration are as follows: The credibility of witnesses is so peculiarly and exclusively within the province of the jury that we think it would be improper for the court to give such an instruction as that under consideration, which was refused in the case before us, because of its singling out by name certain witnesses. We think that naming of any particular witness or witnesses in such an instruction would tend to lodge upon the minds of the jury the impression that the trial judge is not satisfied as to the truth of the testimony of the witness or witnesses mentioned; which would certainly be an improper invasion of the province of the jury. If indeed it is an admitted or uncontroverted

fact, or there is clear and convincing evidence in the case that a witness or witnesses therein has or have willfully, or, which is the same thing, knowingly, testified untruthfully on any material matter, such an instruction as that under consideration may, in the discretion of the trial court, be properly given, if couched in general terms, to the effect that if the jury believe from the evidence that any witness or witnesses in the case have so testified, they are at liberty to disregard the whole of their testimony. But the trial judge should, as to such an instruction, in every case, act with caution; he should never give such an instruction unless from all the evidence he believes that willful false swearing has been done; and even then he should refuse to give such an instruction if he feels that the jury would be warranted by the evidence in coming to a different conclusion as to such testimony.

These being our views, it follows that there was no error in the refusal of the instruction in question.

[22] 11. The eleventh assignment of error is that the court modified instruction No. 7, given at the request of the accused, by inserting the word "equally" before the word "susceptible."

This instruction, as given, is as follows: "The court instructs the jury that every fact necessary to constitute the offense charged must be proven beyond a reasonable doubt, and that if there is a reasonable doubt as to any such fact, they shall acquit; that the result of the evidence must be to exclude every reasonable hypothesis of innocence, and be consistent only with the guilt of the accused; that the jury is not at liberty to guess, and where a fact is equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, they cannot arbitrarily adopt that interpretation which incriminates him."

Accurately speaking, the modification was error. The use of the word "equally" in such a connection would be proper

in a civil, but is not in a criminal case. But this distinction is not one which is likely to have occurred to the jury. It in no way appears that the verdict of the jury was influenced in the slightest degree by the modification of the instruction. We must, therefore, regard the error as harmless.

[23, 24] 12. The twelfth assignment of error is that the court erred in overruling the motion of the accused to set aside the verdict and grant him a new trial because the verdict is contrary to the law and the evidence.

What has been said above renders it unnecessary for us to enter upon any further detailed consideration of the evidence than that which concerns the question of fact whether the accused threw the rock which killed the deceased. It is urgently contended for the accused that the testimony of all of the eyewitnesses of the occurrence leaves it undetermined who threw the fatal rock. This is true in so far as direct testimony to the act of throwing the rock is concerned. But there is testimony showing the circumstances of the positions and attitude of the various persons engaged in the affray immediately preceding and at the time of the homicide, which tends strongly to show that the accused struck the fatal blow with the rock. And there is the testimony of two witnesses for the Commonwealth that the accused admitted that he did so. Some of the latter testimony couples this admission, it is true, with the claim on the part of the accused that he did this in self-defense. But the jury were at liberty, if they felt the evidence warranted it, to accept the truth of a portion of such admission and discard the rest; and that the evidence did warrant this, we have no doubt. J. P. Thomas testified: "Herman (the accused) said, 'I did it, had to do it to save myself, he (the deceased) was advancing on me with rocks.'" The testimony for the Commonwealth was to the effect that the deceased was not advancing on the accused with rocks, or at all, as claimed by the accused, and that the accused did

not have to strike the deceased with the rock in self-defense. Harry Jarrell testified: "Herman said he had done it;" and "the next night Herman Jarrell said to me, 'we had better get together and get our tales straight'."

We deem it sufficient, therefore, to say, in conclusion of the consideration of the assignment of error last mentioned, that while the evidence is extremely conflicting on the subject of the motive of the killing, and there is evidence in the record which would have warranted the jury in finding the accused not guilty had they given credit to it, at the same time there is evidence which warranted the jury in finding the verdict of guilty, which they did. That verdict is conclusive upon the facts in issue. We find no material error in the instructions or in the action of the court in refusing instructions. The verdict is not in conflict with the instructions given. It is, therefore, not within the province of this court to set aside the verdict.

[25] 13. The thirteenth and last assignment of error is that the court erred in overruling the application of the accused for bail.

In view of the conclusions reached above, the case will have to be affirmed, so that the accused will not hereafter have any right of bail. Hence, as the case stands, the assignment of error just stated presents a purely moot question, which, therefore, we will not undertake to decide.

The case will be affirmed.

*Affirmed.*

BURKS, J., *dissenting*:

I am unable to concur in so much of the foregoing opinion as holds that it was harmless error to permit the witness to testify as to what he heard Kirtley say after the homicide, and which is discussed under the head of the fifth assignment of error. I also think that it was error to refuse the instruction on the subject of flight, and that the refusal was not harmless.