# Richmond

HELEN WHITLOW V. COMMONWEALTH OF VIRGINIA.

June 18, 1956.

Record No. 4528.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*Bentley Hite*, for the plaintiff in error.

*Thomas M. Miller, Assistant Attorney General, (J. Lindsay Almond, Jr., Attorney General*, on brief), for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

This writ of error brings under review the judgment of conviction entered pursuant to a jury's verdict finding the defendant, Helen Whitlow, guilty of violating the "hit and run" statute (Code, § 46-

189), the material portion of which is copied in the margin.[1] The only question properly presented to us is whether the evidence is sufficient to sustain the verdict and judgment.

The evidence on behalf of the Commonwealth shows that at about 8:00 p. m. on January 17, 1955, Roy Charles Lester, a 12-year-old boy, while riding on a bicycle southwardly along Highway No. 693, near his home in Roanoke county, was struck by a truck proceeding in the opposite direction. As the result of the collision the boy was thrown from the bicycle into a ditch which runs along the western side of the road and severely injured. The operator of the truck did not stop after the impact, but, as the boy said, put his vehicle "in another gear and went faster," leaving the scene. At the time of the collision the boy was unaccompanied and no one else saw the collision. He was unable to identify the vehicle other than to say that it was "a big truck."

Members of the boy's family heard his cries and came to his assistance. After he had been taken to the hospital some of the members of the family with neighbors remained at the scene. Some ten or fifteen minutes after the accident a 1942 Chevrolet dump truck, bearing State license number T57-950 and owned by the defendant, Helen Whitlow, came along the road proceeding southwardly. It was being driven by the defendant's young son, Joy Whitlow. The defendant was riding in the cab. Upon signal the driver brought the truck to a stop. The occupants of the vehicle were told that they had shortly before struck the Lester boy and must remain at the scene until the State police arrived. The defendant and her son denied that they had been involved in a collision and refused to remain. The defendant said that on her way home she would stop at the State police headquarters and report the occurrence of the accident. In the meantime Paul Basham, a bystander, wrote down the license number of the Whitlow truck. Witnesses on behalf of the Commonwealth fixed these occurrences at between 8:10 and 8:15 p. m.

---

[1] "§ 46-189. *Duty of driver to stop, etc., in event of accident; duty of occupant, witness, etc.*—The driver of any vehicle involved in an accident resulting in injuries to or death of any person or damage to property shall immediately stop at the scene of such accident or as close thereto as is possible without obstructing traffic and give to the person struck and injured, or to the driver or some other occupant of the vehicle collided with, his name, address, operator's or chauffeur's license number and the registration number of his vehicle. * * * The driver shall also render reasonable assistance to any person injured in such accident, including the carrying of such injured person to a physician, surgeon or hospital for medical or surgical treatment if it is apparent that such treatment is necessary or is requested by the injured person."

Basham testified that he followed the Whitlow truck past the police station and noted that it did not stop there. He turned in to the dispatcher the license number of the Whitlow truck, although he said he could not recall what number it was. The "log" showed that at 8:16 p. m. a report was received that a truck bearing license T57-590 had been involved in an accident. Although the number recorded in the "log" was not the same as that of the Whitlow truck, T57-950, the police, who had recently had trouble with the Whitlow truck, assumed that it had been involved in the present accident and set out to locate it.

S. M. Lynch, a deputy sheriff, intercepted the Whitlow truck near the defendant's home. Joy Whitlow was driving and was accompanied by his mother, the defendant. Lynch testified that he inquired of the defendant and her son whether their vehicle had been involved in a "hit and run" accident. While he said the boy seemed "pretty nervous," both he and his mother denied that it had been so involved. The officer then examined the truck to ascertain whether it showed any sign of having been involved in a collision. He found what he described as "a fresh scratch" on "the right hand of the bumper." He inquired of Joy Whitlow "what caused those scratches," and his reply was that "he didn't know." Thereupon the officer placed both the defendant and her son under arrest and told them they must report to police headquarters at Salem. Joy Whitlow was directed to ride with the officer while the defendant was permitted to drive her truck to headquarters. After a short delay which caused the officer to wonder whether the defendant would report at headquarters, she finally arrived there. Officers at the headquarters again questioned both the defendant and her son as to whether they had been involved in an accident. They denied that they had, although the defendant seemed reluctant to discuss the matter until she had contacted the local representative of her insurance carrier.

Other officers examined the truck and found the marks as testified to by Deputy Sheriff Lynch on the right bumper. One officer testified that the bumper appeared to have been recently "wiped off."

The record shows that the defendant's son, Joy, had recently been in trouble and placed on probation.

The defendant admitted that on the night of the accident she had driven the truck northwardly along the road past the place where the accident occurred, on her way to the home of Cordie Maxey which is located some 500 feet to the north. She said that on the

trip past the scene of the accident she did not see any one on a bicycle and passed no vehicles on the road. She said that she and her son had gone to Maxey's home to collect some money, had left there about 8:35 p. m., and proceeded northwardly along the road to a site where she was building a house. Upon their return along the same road her son was driving when they were stopped at the scene, as has been related.

Cordie Maxey fixed the time of the Whitlows' visit to his home at approximately 8:00 p. m., and said that within fifteen minutes after they had left he heard of the accident.

The Commonwealth's evidence further shows that the road on which the accident happened comes to a dead end about a mile north of the scene; that the members of the boy's family and neighbors remained at the place where the accident occurred until 10:30 p. m., and no truck other than that of the defendant returned along the road. Furthermore, Albert Maxey, who lives on the road about 200 yards from the scene, testified that shortly after he learned of the accident he drove his car northwardly to the end of the road in search of some vehicle which might have been involved in the collision, but saw none.

As has been said, no one except the injured boy saw the collision and he was unable to identify the truck which struck him. The evidence that the defendant's truck was the one involved is therefore entirely circumstantial. In short, the Commonwealth's case is this: Its evidence shows that the defendant drove the truck northwardly along the road past the scene at about the time of the accident; no other vehicle was shown to have passed there at or about that time; a search of the vicinity made shortly after the accident revealed no other truck; no other vehicle returned along the dead-end road between the time of the accident and 10:30 p. m.; fresh marks on the bumper of the truck showed that it had recently been in a collision; the defendant's conduct after the accident was indicative of guilt in that she was reluctant to remain at the scene, failed to carry out her promise to report at police headquarters the occurrence of an accident, and was reluctant to discuss with the police whether she had been involved in the collision.

In our opinion, these circumstances do not warrant a finding beyond a reasonable doubt that the truck of the defendant was involved in the accident. Too many essentials in the chain of circumstances are lacking. There is no evidence as to the number of trucks or

other vehicles which normally use the road, whether many or few. Albert Maxey, who lived near the scene of the accident, testified that the road extended about a mile northwardly therefrom. There are, he said, several roads leading off from the main road. There is no showing as to the opportunity, or lack of opportunity, for the concealment of a truck along these roads during the nighttime. The nature of the search which this witness said he made for a suspected truck or other vehicle is quite significant. He did not observe the Whitlow truck itself which was, during his search, stopped at his brother's house about 500 feet from the scene of the accident. How many other vehicles he may have missed in his search we, of course, do not know.

The fact that no other truck passed the scene going south on the road from the time of the accident until 10:30 p. m. is, of course, not conclusive proof that another truck was not in the vicinity. Another truck might have passed after the neighbors had ceased their watch, or might have been concealed off the road during the night.

The marks on the right bumper of the truck are inconsistent with the known physical facts of the collision. It is undisputed that the head-on collision threw the boy and his damaged bicycle into the ditch on his right, that is, on the western side of the road, while the marks on the bumper were on the right end, that is, on the end away from the on-coming bicycle.

It is true that certain related conduct of the defendant after having been told that she had been involved in a collision may have been indicative of guilt. But, on the other hand, it is most unlikely that she would have stopped her truck for a business transaction at the Cordie Maxey house, just 500 feet from the scene, had she known that her vehicle had just been involved in a collision and that she had violated the law by leaving the scene.

The record shows that Phyllis Mills and a Mrs. Marshall were near the scene at the time of the accident and may have seen the truck involved. It further appears from the record that Danny Ray Stump was in possession of evidence as to the identity of the truck involved in the accident. None of these witnesses was called to testify, nor was the failure to call them explained.

There is no explanation of the source of the information which caused the "log" at police headquarters to show that a truck bearing license number T57-590 had been involved in the accident. The person who made the entry in the "log" did not testify. We are not told

whether the entry was based on the information given by Basham, who testified that he turned in the number of the Whitlow truck, or otherwise. The record is silent as to whether a local truck bore the license T57-590, noted in the "log," and if so, whether it was near the scene on the night of the accident.

These discrepancies and unexplained matters cast doubt upon the correctness of the verdict. They should be clarified on a new trial.

For these reasons the judgment is reversed, the verdict of the jury set aside, and the case remanded for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*